UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MAUDER and ALICE CHAO; DEOGENESO and GLORINA PALUGOD, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>AURORA LOAN SERVICES, LLC,<br><br>            Defendant. | Case No: C 10-03383 SBA<br><br>Related to:<br>C 10-03118 SBA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>Dkt. 27 |

Plaintiffs Mauder and Alice Chao and Deogeneso and Glorina Palugod (collectively "Plaintiffs") filed the instant class action on behalf of themselves and all others similarly situated to challenge the allegedly unfair and unlawful business practices of Defendant Aurora Loan Services, LLC ("Aurora") with respect to its use of mortgage "Workout Agreements." The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

The parties are presently before the Court on Aurora's Motion to Dismiss Plaintiff's First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 27. Having read and considered the papers filed in connection with this matter, and being fully informed, the Court hereby DENIES the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).

# I. BACKGROUND

## A. FACTUAL SUMMARY

The following summary is based on the factual allegations in the First Amended Complaint ("FAC") which are taken as true for the purposes of the instant motion.

### 1. The Chaos

Plaintiffs Mauder and Alice Chao ("the Chaos") owned a residential property at 2284 Fallingtree Drive in San Jose, California ("the Chao property"). FAC ¶ 38, Dkt. 17; FAC Ex. B. Defendant Aurora serviced the loan on the Chao property. FAC ¶ 40. In early 2009, the Chaos began experiencing financial difficulties, and thus, sought a loan modification from Aurora. Id. ¶ 42.

On April 7, 2009, Aurora filed a Notice of Default and Election to Sell Under Deed of Trust ("NOD") through its agent, Quality Servicing Corp. ("Quality"). Id. ¶ 43. The NOD stated the default amount was $11,902.92. FAC Ex. A. On July 9, 2009, Aurora filed a Notice of Trustee's Sale ("NOS") through Quality. FAC ¶ 44. The NOS set July 28, 2009 as the date of sale. Id.

On July 10, 2009, Aurora sent a letter to the Chaos stating that "[d]epending upon your current financial situation, it may be possible for us to offer you one or more of the following programs that will avoid the loss of your home through foreclosure or further impairment on your credit." Id. ¶ 45; FAC Ex. C. The letter listed five options: a repayment plan, forbearance plan, loan modification, pre-foreclosure sale, or deed in lieu of foreclosure. Id. ¶ 45; FAC Ex. C. The letter stated that under the "forbearance plan," the Chaos "may be able to suspend or reduce [their] mortgage payments for a short period of time." Id. ¶ 46; FAC Ex. C. Thereafter, it stated, Aurora would "review [the Chaos'] current financial situation and determine what home retention option would best assist [them] in bringing [their] loan current." FAC Ex. C.

On or about October 12, 2009, Aurora sent a Workout Agreement to the Chaos, which required them to make an initial payment of $5,668 by October 15, 2010, followed by five consecutive monthly payments of $3,100. FAC ¶¶ 50, 52; FAC Ex. D. The

Workout Agreement indicated the Chaos' total arrearage as $31,852.88. FAC Ex. D. The agreement stated that the parties agreed that the Chaos had defaulted on their mortgage and that "Customer has requested and Lender has agreed to allow Customer to repay the Arrearage pursuant to a loan work-out arrangement on the terms set forth herein." Id. The agreement also stated that Aurora could commence foreclosure or resume a pending foreclosure action without further notice if the Chaos defaulted under the terms of the Workout Agreement. Id. ¶¶ 6, 8.

Attached to and incorporated into the Workout Agreement is a document styled as "Attachment A—Stipulated Payments," which sets forth the Chaos' payment obligations. Id. The Attachment begins with the following:

> For purposes of repayment of the Arrearage, Customer shall pay a stipulated payment of $5668.00 (the "First Plan payment"), on or before 10/15/2009. Thereafter, Customer shall pay five (5) consecutive stipulated monthly payments each in the amount of $3100.00 on or before the 20th day of every month . . . commencing 10/20/2009 and continuing through and including 02/20/2010 . . . .

Id. ¶ a.1 (emphasis added). Despite the stated purpose of "repayment of the Arrearage," the final paragraph of the Attachment contains the ostensibly contradictory statement that "[t]he aggregate Plan payment will be insufficient to pay the Arrearage. At the Expiration Date, a portion of the Arrearage will still be outstanding." Id. ¶ b. The Attachment further states that after all scheduled payments have been made, the Customer must "cure the Arrearage through a full reinstatement, payment in full, loan modification agreement or other loan workout option that Lender may offer . . . ." Id. The Chaos executed and returned the agreement. FAC ¶ 50.

The Chaos made each payment and provided all written materials that Aurora sought for the purpose of evaluating their loan for a modification. Id. ¶ 57. After the Workout Agreement expired, Aurora neither advised the Chaos that a loan modification had been denied nor did it advise them that they needed to pursue another option to cure their default in order to avoid foreclosure. Id. ¶ 58. To the contrary, Aurora told the Chaos their foreclosure was "on hold" and requested that they continue making the monthly payments

stipulated in the Workout Agreement while it continued reviewing their loan for possible modification. Id. ¶ 59. The Chaos made additional monthly payments of $3,100 on or about March 12, 2010, April 20, 2010, and May 18, 2010. Id. ¶ 60.

On May 12, 2010, Aurora confirmed that it had received all of the documents necessary for it to review the Chaos' loan, and represented to the Chaos that the foreclosure was "on hold" pending review of the loan for possible modification. Id. ¶ 62. Aurora instructed the Chaos to call back for a status update on or about May 26, 2010. Id. The Chaos called Aurora on May 27, 2010, but Aurora told them their loan modification was denied on May 13, 2010, and that their home had been sold in foreclosure on May 24, 2010. Id. ¶ 63. The Chaos were served with a Notice to Vacate the next day on May 28, 2010. Id. ¶ 64.

Under the terms of the Workout Agreement and the three additional monthly payments the Chaos made during the pendency of Aurora's loan modification review, they paid a total of $33,568 to Aurora. Id. ¶ 71. They were neither notified that Aurora denied their loan modification request nor afforded an alternate opportunity to cure before Aurora sold their home. Id.

### 2.     The Palugods

Plaintiffs Deogeneso and Glorina Palugod ("the Palugods") owned a residential property at 3233 Sprucegate Court in San Jose, California (the "Palugod property"). Id. ¶ 72; FAC Ex. G. Aurora serviced the loan on the Palugod property. FAC ¶ 73. In early 2009, the Palugods began experiencing financial hardships due to an illness in their family and the death of a parent. Id. ¶ 74. As a result, the Palugods sought a loan modification from Aurora. Id. ¶ 75.

On May 21, 2009, Aurora filed an NOD for the Palugods loan through its agent, Cal-Western Reconveyance Corp. ("Cal-Western"). Id. ¶ 76. The NOD stated the default amount was $10,768.67. FAC Ex. E. On August 27, 2009, Aurora filed a NOS through Cal-Western. FAC ¶ 77. The NOS set September 15, 2009 as the date of sale. Id.

On September 9, 2010, Aurora offered the Palugods a Workout Agreement containing essentially the same terms found in the Chao's Workout Agreement. Id. 78; FAC Exs. D & G. The Workout Agreement stated the Palugods' total arrearage as $22,742.91. FAC Ex. G. The agreement required the Palugods to make an initial payment of $2,466.68 by October 1, 2010, followed by three stipulated monthly payments of $2,653.00. FAC ¶ 81; FAC Ex. G.

The Palugods made each payment and provided all written materials that Aurora sought for the purpose of evaluating their loan for a modification. FAC ¶ 85. When the Workout Agreement expired, Aurora told the Palugods their foreclosure was "on hold" and asked them to continue making the monthly payment stipulated in the Workout Agreement while it continued reviewing their loan for a possible modification. Id. ¶ 86. The Palugods made monthly payments of $2,653 on or about February 1, 2010, March 1, 2010, April 1, 2010, May 1, 2010, and June 1, 2010. Id. ¶ 87.

On June 17, 2010, Aurora confirmed that it had all of the documents it required to review the Palugods' loan, and it told them that foreclosure was "on hold" while Aurora reviewed their loan for possible modification. Id. ¶ 90. Despite this representation, five days later, on June 22, 2010, a realtor informed the Palugods that their home, in fact, would be sold through a foreclosure sale. Id. ¶ 91. The Palugods immediately contacted Aurora, which confirmed that their home would be foreclosed upon on June 24, 2010. Id. In addition, Aurora informed the Palugods that they could no longer cure their default or halt the foreclosure sale for any reason, as the date of sale was less than five days away. Id. The Palugods were served with a Notice to Vacate on June 29, 2010. Id. ¶ 92.

Under the terms of the Workout Agreement and the five additional monthly payments the Palugods made during the pendency of Aurora's loan modification review, they paid Aurora a total of $23,690.68. Id. ¶ 95. The Palugods were not notified that Aurora denied their loan modification request until June 22, 2010, and they were not afforded an alternate opportunity to cure before Aurora sold their home. Id. ¶ 95.

### B. PROCEDURAL HISTORY

Plaintiffs commenced the instant action in this Court on August 2, 2010. Compl., Dkt. 1. On October 12, 2010, the Court related the instant action to <u>Pinel v. Aurora Loan Services, LLC</u>, No. C 10-03118 SBA. Related Case Order, Dkt. 13. Aurora thereafter filed a motion to dismiss all claims on October 15, 2010. Dkt. 14. On November 5, 2010, before the motion was adjudicated, Plaintiffs filed the FAC with various attached exhibits. FAC. As a result, the Court denied Aurora's motion to dismiss as moot on January 7, 2011. Dkt. 23.

The FAC alleges six state law causes of action: (1) fraudulent inducement; (2) failure of consideration; (3) violation of California's Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code §§ 1788, et seq.; (4) unjust enrichment; (5) breach of the covenant of good faith and fair dealing; and (6) violation of California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200, <u>et seq.</u> FAC ¶¶ 106-62. Plaintiffs allege that Aurora induces financially distressed borrowers into Workout Agreements that purport to offer an opportunity to cure loan default, but instead serve as a ruse through which Aurora collects thousands of dollars it otherwise could not collect immediately before foreclosing. <u>Id.</u> ¶ 1. According to Plaintiffs, Aurora does not afford borrowers an opportunity to cure despite promising to do so in the Workout Agreements. <u>Id.</u> ¶ 2. Plaintiffs further allege that Aurora has reaped profits exceeding $100 million through this scheme. <u>Id.</u> ¶ 1. Aurora now moves to dismiss all claims alleged in the FAC. Dkt. 27, 30. The motion has been fully briefed and is ripe for adjudication.

## II. LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990). In deciding a Rule 12(b)(6) motion, the court must generally "consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters

properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted). Where a complaint or claim is dismissed, leave to amend generally is granted, unless further amendment would be futile. Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1087-88 (9th Cir. 2002).

## III. DISCUSSION

### A. COUNT I: RESCISSION AND RESTITUTION – FRAUDULENT INDUCEMENT

In their first claim for relief, Plaintiffs seek rescission and restitution on the ground that their consent to the Workout Agreements "was not real or free in that it was obtained solely through fraud and misrepresentation[.]" FAC ¶ 108. Plaintiffs allege that Aurora never intended to provide them an opportunity to cure their defaults. Id. ¶ 115. Rather, they allege that Aurora devised a fraudulent scheme to extract payments from them which it could not have collected otherwise had it simply foreclosed and sold their properties because California law forbids deficiency judgments. See Cal. Civ. Proc. Code §§ 580b, 580d & 726. Plaintiffs describe the workings of this alleged fraud in detail: (1) Aurora filed an NOD and NOS so that it could execute a foreclosure sale without providing further notice to the borrower, FAC ¶ 112; (2) Aurora then offered Workout Agreements with language leading Plaintiffs to believe they would have an opportunity to cure their default, Id. ¶ 114; and (3) Aurora used the Workout Agreements to extract payments it could not collect otherwise knowing it had no intention of providing Plaintiffs an opportunity to cure, Id. ¶¶ 115-118.

#### 1. Fraud Allegations

Under California law, a party to a contract may rescind if its agreement was "obtained through duress, menace, fraud, or undue influence, exercised by or with the

- 7 -

1  connivance of the party as to whom he rescinds, or of any other party to the contract jointly
2  interested with such party." Cal. Civ. Code § 1689(b)(1). Allegations of fraud must satisfy
3  Rule 9(b), which requires plaintiffs to allege "the who, what, when, where, and how" of the
4  allegedly fraudulent conduct, Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997), and to
5  "set forth an explanation as to why [a] statement or omission complained of was false and
6  misleading," In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc).

7       Aurora argues the FAC fails to comport with Rule 9(b) because Plaintiffs have failed
8  to identify any misrepresentations in the Workout Agreements. Def.'s Mot. at 8.
9  According to Aurora, the Workout Agreements expressly disclosed that it had the right to
10 foreclose immediately without further notice if the Plaintiffs failed to cure their arrearages.
11 Id. at 6-7. Aurora thus claims that in foreclosing on Plaintiffs' properties, it did what the
12 Workout Agreements expressly represented; namely, it delayed proceeding with
13 foreclosure for the duration of the agreements and foreclosed without notice only after the
14 agreements expired. Id. This argument fails.

15      In the related case Pinel v. Aurora Loan Servs., LLC, No. C 10-3118 SBA, 2011 WL
16 3843960 (N.D. Cal. Aug. 30, 2011), which involves essentially the same Workout
17 Agreement at issue here, the Court rejected the argument now being posited by Aurora in
18 this case. As in Pinel, Aurora incorrectly presupposes that its only obligation under the
19 Workout Agreement was to forebear on foreclosure. Id. at *10. As in Pinel, Plaintiffs
20 allege that Aurora's consideration for the Workout Agreements included both temporary
21 forbearance and an opportunity to cure their loan defaults. FAC ¶ 109. Although
22 Attachment A to the Workout Agreement discloses that the "aggregate Plan payment will
23 be insufficient to pay the Arrearage," Aurora never reconciles this provision with the
24 contrary recital in the Workout Agreement which confirms that Aurora "has agreed to
25 allow Customer to repay the Arrearage pursuant to a loan work-out arrangement[.]" See
26 FAC Exs. D & G. Nor does Aurora reconcile the first clause in the Attachment, which
27 explicitly states that the payment plan is being implemented "[f]or the purposes of
28

1 repayment of the Arrearage[.]" FAC Exs. D & G.[1]  The Court is not at liberty to credit the
2 provisions of the Workout Agreement that favor Aurora while ignoring those which do not.
3 See Pinel, 2011 WL 3843960, at *10; Sunset Sec. Co. v. Coward-McCann, Inc., 47 Cal. 2d
4 907, 911 (1957) ("It is beyond question that every provision of a contract should be
5 examined to determine the meaning and intention of the parties.") (emphasis added).
6    Aurora's attempt to analogize this case to Smith v. National City Bank, No. C 09-
7 5715 SI, 2010 WL 1729392 (N.D. Cal. Apr. 27, 2010) is misplaced.  In Smith, after the
8 plaintiff received a notice of sale, she entered into a Forbearance Agreement with her
9 lender to delay foreclosure until she returned to work following surgery.  Their agreement
10 explicitly provided that "[i]t is Borrower's sole responsibility to contact Lender prior to the
11 expiration of the Agreement on February 15, 2009, to determine the current status of the
12 loan and the potential necessity for further loss mitigation efforts . . . ." Id. at *1.  On
13 March 2, 2009, plaintiff contacted the lender and learned that a loan modification was not
14 forthcoming. Id. at *2.  On March 18, 2009, the lender notified plaintiff that it was
15 recommencing foreclosure proceedings. Id.  The district court ruled that there was nothing
16 fraudulent about the Forbearance Agreement, since it did not commit the lender to provide
17 a loan modification. Id. at *3.
18    Smith is distinguishable.  Unlike the Forbearance Agreement in Smith, Aurora's
19 Workout Agreements fail to inform borrowers that they bear the sole responsibility to
20 inquire about the status of their chosen method of cure and to determine if an alternative
21 means of curing their default is necessary. See id. at *1. Moreover, the lender in Smith, in
22 fact, provided the precise notice that Plaintiffs in this case allege Aurora did not.  There, the
23 lender notified the plaintiff that her loan modification had been denied sixteen days before
24 it sold her home. See id., at *2.  Here, Aurora was reviewing Plaintiffs' loans for possible
25 modification at the time the agreements expired.  FAC ¶ 59, 86.  Loan modification was
26
27   [1] The fact that Aurora styled the agreement as a "Workout Agreement" implies the intent to allow borrowers to resolve the default that led to the notice of sale in the first
28 instance.

one of the four cure methods specified in Attachment A to the Workout Agreements. FAC Ex. D & G. But unlike the lender in Smith, Aurora never gave Plaintiffs timely notification that it had denied their respective requests for loan modifications. FAC ¶¶ 59-63, 86-91. As a result, Plaintiffs had no opportunity to pursue one of the other three agreed-upon cure methods. See FAC Exs. D & G.[2]

### 2. Harm

Aurora next contends that Plaintiffs could not have suffered any actual harm as a result of the Workout Agreements, ostensibly because the agreements required them to pay amounts to which they were already contractually committed to repay under their mortgages. Def.'s Mot. at 12-14. As support for this contention, Aurora relies on Newgent v. Wells Fargo Bank, N.A., No. 09cv1525 WQH (WMC), 2010 WL 761236 (S.D. Cal. Mar. 2, 2010). In Newgent, the plaintiff alleged that a Wells Fargo employee informed her over the telephone that the bank would delay the sale of her home and process her loan modification request if she sent a payment of $2,500.77. Id., at *1. The plaintiff sent the payment, and Wells Fargo received it. Id. Nevertheless, Wells Fargo sold the plaintiff's home on the originally scheduled sale date. Id. The plaintiffs brought claims of conversion and equitable and promissory estoppel against Wells Fargo. Id., at *5-7. The Newgent court ruled, inter alia, that the plaintiff's conversion claim was legally infirm. Id., at *6. Because California Code of Civil Procedure sections 580d and 726 only address deficiency judgments after a foreclosure sale—and thus do not forbid collection of payments on delinquent mortgages prior to a foreclosure sale—the court dismissed the plaintiff's conversion claim. Id., at *5-6.

Newgent is inapposite. First, Newgent did not address a rescission claim. Id. at *5-7. Further, it did not involve the sort of fraudulent scheme alleged here, where Aurora purportedly induced Plaintiffs to enter into multi-payment agreements based on

---

[2] Aurora sold the Chaos' home without notifying them that it had denied their modification request. FAC ¶ 62-64. The Palugods learned that Aurora denied their modification two days before Aurora sold their home. Id. ¶¶ 90-91. Aurora allegedly told them it was too late to cure their default at that time. Id. ¶ 91.

representations or understandings that doing so would enable them to pay off their arrearages, cure their respective defaults, and avoid foreclosure.  In challenging this scheme, Plaintiffs do not allege that Aurora violated the deficiency judgment statutes themselves.   Rather, they allege Aurora fraudulently touts its Workout Agreements to financially distressed borrowers because it knows California's mortgage foreclosure framework allows it to collect only the proceeds from sale if it follows through with foreclosure.  See FAC ¶¶ 29, 114.  Plaintiffs allege Aurora never intended to allow them the opportunity to cure it purportedly promised in the Workout Agreements.  Id. ¶ 127.  Instead, it allegedly sold Plaintiffs' properties without notifying them that it denied their chosen cure method and without affording them an opportunity to cure through one of the other agreed-upon cure methods.  In doing so, Aurora allegedly deprived Plaintiffs of the benefit of their agreements and caused Plaintiffs to lose their properties in foreclosure.  Thus, Plaintiffs have stated a claim for fraudulent inducement under California Civil Code section 1689(b)(1).

       **B.**      **COUNT II: RESCISSION AND RESTITUTION – FAILURE OF CONSIDERATION**

California law also provides that a party to a contract may rescind the agreement where "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds."  Cal. Civ. Code § 1689(b)(2).  Failure to perform any material part of a contract can justify rescission.  See Bonadelle Const. Co. v. Hernandez, 169 Cal. App. 2d 396, 399 (1959) ("A partial failure of consideration resulting from the willful failure of plaintiff to perform a material part of the contract is sufficient to justify defendants' rescission.").

Aurora repeats its contention that its sole promise under the Workout Agreements was temporary forbearance for the duration of the agreements.  Def.'s Mot. at 9.  However, Plaintiffs allege that Aurora agreed both not to foreclose for the duration of the Workout Agreements and to provide Plaintiffs with an opportunity to cure.  FAC ¶ 126.  As set forth above, the language of the Workout Agreements is ambiguous in this respect.  On a motion to dismiss—where the pleadings are construed in the light most favorable to the

Plaintiffs—the Court cannot determine whether Aurora's consideration materially failed as a matter of law. Therefore, Aurora's motion to dismiss Plaintiffs' failure of consideration claim is denied. See Sunstone Behavioral Health, Inc. v. Alameda Cnty. Med. Ctr., No. CIV. S-062664 FCD DAD, 2007 WL 1219299, at *5 (E.D. Cal. Apr. 25, 2007).[3]

### C. COUNT III: THE ROSENTHAL ACT

Plaintiffs' third claim alleges that Aurora violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' debt. FAC ¶ 133. The Rosenthal Act forbids the use of any "false, deceptive, or misleading representation or means in connection with the collection of any debt" through its incorporation by reference of the federal Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692(e). See Cal. Civ. Code § 1788.17. Demands for payment, not informational letters regarding the status of a debtor's account, satisfy § 1692(e)'s requirement that a communication be "in connection with the collection of any debt." See Walcker v. SN Commercial, LLC, 286 Fed. App'x 455 (9th Cir. 2008).

Aurora contends that Plaintiffs' Rosenthal Act claim fails on three grounds. First, Aurora posits that the Workout Agreements and accompanying cover letters did not constitute a demand for payment, and thus, cannot form the basis for a Rosenthal Act claim. See Def.'s Mot. at 14-15. Second, Aurora contends that the FDCPA does not apply because Plaintiffs initiated contact with Aurora by calling about the status of their modification requests. See id. at 16. Third, Aurora argues that Plaintiffs identify no misrepresentations made by Aurora. See id.

Taking Aurora's arguments in order, the Court finds Aurora's Workout Agreements to differ from the "informational letters" at issue in Walcker. See 286 Fed. App'x at 457. The first letter in Walcker notified the plaintiffs that their loan had been transferred from a

---

[3] Aurora argues that the statute of frauds bars Plaintiffs' argument that Aurora orally extended their Workout Agreements. Def.'s Mot. at 10. However, Plaintiffs allege the written Workout Agreements promised them an opportunity to cure. FAC ¶¶ 111, 126. These allegations survive Aurora's motion to dismiss. Thus, Aurora's statute of frauds argument is moot. See Yates v. Aurora Loan Servs., LLC, No. C-11-00695 EDL, 2011 WL 2429376, at *5 (N.D. Cal. June 13, 2011).

- 12 -

bank to the defendant loan servicer. See id. at 457. The second letter discussed the various options available to the plaintiffs for paying off their loan. See id. at 455. This case is different. Aurora contacted Plaintiffs about possible home-retention options after foreclosing on their properties, and it offered Workout Agreements that purported to be such home-retention options. See FAC ¶¶ 45, 50, 78.

The Workout Agreements demanded an initial payment by a set deadline followed by scheduled monthly payments in order to delay foreclosure and allow Plaintiffs to cure their arrearages. See id. ¶¶ 52, 55-56, 81, 83-84; FAC Exs. D & G. These agreements are similar to the Trial Period Plan (TPP) contract offers that constituted demands for payment under the Rosenthal Act in Morales v. Chase Home Finance, LLC, No. C 10-02068 JSW, 2011 WL 1670045, at *2, 9 (N.D. Cal. 2011), not the purely informational letters at issue in Walcker. They did more than inform Plaintiffs who their loan servicer was or provide information about payoff options. Rather, like the TPP offers in Morales, Aurora's Workout Agreements demanded payments by set deadlines while further loan modification was pending. See 2011 WL 1670045, at *2, 9. This is sufficient to demonstrate demand for payment under the Rosenthal Act. See id., at *9.

Next, Aurora contends that Plaintiffs improperly predicate their Rosenthal Act claim on oral statements that Aurora made in response to Plaintiffs' phone calls. See Def.'s Mot. at 16. Plaintiffs' Rosenthal Act claim is not so limited. See FAC ¶¶ 131-35. Although the FAC references Aurora's oral requests for documents and oral assurances that loan modification was pending, it also broadly alleges that Aurora used false, deceptive, and misleading statements "in connection with its collection of Plaintiffs' and the Class's mortgage debt." FAC ¶ 133. Plaintiffs also re-allege all preceding paragraphs by reference, many of which specifically discuss the allegedly fraudulent written Workout Agreements. Id. ¶ 131; see also FAC ¶¶ 52, 55, 81, 83-84, 111, 126 (specifically discussing written Workout Agreements). Notably, in their opposition to Aurora's motion to dismiss, Plaintiffs confirm that their Rosenthal Act claim is based solely on the written documents

Aurora provided them.  Pls.' Resp. at 20-21, Dkt. 29.  As such, Aurora's second contention lacks merit.

Finally, Aurora contends that Plaintiffs fail to identify any misrepresentations made by Aurora.  Def.'s Mot. at 16.  When evaluating a Rosenthal Act claim, the Court must determine whether the alleged communications from the debt collector would likely mislead "the least sophisticated debtor."  See Guerrero v. RJM Acquisitions LLC, 499 F.3d 926, 934 (9th Cir. 2007).  As stated above, Aurora's Workout Agreements contain contradictory language, some of which suggests the purpose of the agreements was to cure of Plaintiffs' arrearages and that the agreements would afford an opportunity to do so.  The ambiguous language in the Workout Agreements could mislead the "least sophisticated debtor."  See Guerrero, 499 F.3d at 934.  Therefore, the Court denies Aurora's motion to dismiss Plaintiffs' Rosenthal Act claim.

### D.     COUNT IV: UNJUST ENRICHMENT

Aurora contends that a quasi-contract action for unjust enrichment does not lie where a binding contract defines the parties' rights.  Def.'s Mot. at 17.  The elements of unjust enrichment are: (1) receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another.  Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1593 (2008).  Under California law, unjust enrichment is an action in quasi-contract.  Paracor Fin. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).  "However, as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights."  Cal. Med. Ass'n v. Aetna U.S. Healthcare, 94 Cal. App. 4th 151, 172 (2001).

Aurora's contention assumes that a binding contract defines the parties' rights.  But Plaintiffs allege the payments they made were not subject to an express, binding agreement because Aurora fraudulently induced their consent to the Workout Agreements and/or Aurora's consideration failed.  FAC ¶ 142.  Because Plaintiffs' rescission claims survive Aurora's motion to dismiss, the Court also denies Aurora's motion to dismiss Plaintiff's claim for unjust enrichment.

### E. COUNT V: IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The implied covenant of good faith and fair dealing provides that no party to a contract may do anything that would deprive another party of the benefits of the contract. Foley v. Interactive Data Corp., 47 Cal. 3d 654, 683-684 (1988). Aurora contends that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails because the Workout Agreements expressly authorized foreclosure without further notice as soon as the agreements expired. See Def.'s Mot. at 17. Aurora further contends Plaintiffs suffered no harm because their payments under the Workout Agreements were less than the payments Plaintiffs were already obligated to make under their mortgages. See id. at 18.

The Court has already rejected both arguments above. Plaintiffs allege the Workout Agreements obligated Aurora both to forbear and to afford them an opportunity to cure their defaults before it sold their homes. See FAC ¶¶ 109, 145, 148. They allege that Aurora failed to fulfill the latter obligation when it sold their homes without notifying them and denied their attempt to cure through one of the four agreed-upon methods. See id. ¶ 152. Plaintiffs further allege that Aurora's actions caused them harm by depriving them of the benefit of their agreement and damaging them in an amount including the sums they paid pursuant to their respective Workout Agreements. See Id. ¶¶ 151, 154.

Aurora's motion to dismiss Plaintiffs' claim for breach of the covenant of good faith and fair dealing is denied.[4]

### F. COUNT VI: UNFAIR COMPETITION LAW

The UCL makes actionable any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009).

---

[4] To the extent Plaintiffs ultimately prevail under this breach of contract theory, they will be precluded from simultaneously recovering under their theory of unjust enrichment in Count IV. See Cal. Med. Ass'n, 94 Cal. App. 4th at 172. Nonetheless, Plaintiffs are entitled to plead inconsistent causes of action. See Fed. R. Civ. Pro. 8(e)(2); Oki Am., Inc. v. Microtech Int'l, Inc., 872 F.2d 312, 314 (9th Cir. 1989).

The FAC alleges claims under each prong. FAC ¶¶ 158-160. Aurora does not address each prong of Plaintiffs' UCL claim. Rather, Aurora generally contends that Plaintiffs' UCL claim fails because California law requires no further notice of sale following the postponement of a foreclosure sale and because the Workout Agreements did not cause Plaintiffs any injury in fact. See Def.'s Mot. at 18-19.

### 1. Notice of Sale

Aurora first contends it had no obligation to notify Plaintiffs before selling their properties because California Civil Code section 2924g(d) requires no further notice of sale following oral postponement. See id. at 18. It is unclear which prong of Plaintiffs' UCL claim Aurora targets with this argument. But it makes no difference. Plaintiffs' UCL claim does not allege that Aurora violated § 2924g. Rather, Plaintiffs allege that Aurora failed to notify them that it denied their respective attempts to cure using one of the agreed-upon methods in the Workout Agreements. In doing so, Aurora failed to allow Plaintiffs an opportunity to cure their default as it purportedly promised in the Workout Agreements, and it allegedly extracted payments it could not have collected otherwise. The fact that § 2924g(d) permits oral postponement without further notice in isolation does not suggest the entire Workout Agreement scheme that Plaintiffs allege is sheltered from the UCL.

### 2. Standing

In the alternative, Aurora contends that Plaintiffs lack standing to bring claims under the UCL. "Historically, the UCL authorized any person acting for the interests of the general public to sue for relief notwithstanding any lack of injury or damages." Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1359 (2010); see also Californians for Disability Rights v. Mervyn's, LLC, 39 Cal. 4th 223, 227 (2006). In 2004, however, California voters passed Proposition 64, which significantly limited private standing under the UCL. In re Tobacco II Cases, 46 Cal. 4th 298, 316 (2009). "After Proposition 64, . . . a private person has standing to sue only if he or she 'has suffered [an] injury in fact and has lost money or property as a result of such unfair competition.'" Californians for Disability Rights, 39 Cal. 4th at 227 (quoting Cal. Bus. & Prof. Code § 17204). "The specific abuse of the UCL at

1  which Proposition 64 was directed was its use by unscrupulous lawyers who exploited the
2  generous standing requirement of the UCL to file 'shakedown' suits to extort money from
3  small businesses." In re Tobacco II Cases, 46 Cal. 4th at 316. The "intent of California
4  voters [in passing Proposition 64] was to limit such abuses by 'prohibiting private attorneys
5  from filing lawsuits for unfair competition where they have no client who has been injured
6  in fact.'" Id. at 316-17 (citations omitted).

7       In the class action context, standing under the UCL must be established as to the
8  class representative. Id. at 306. Thus, the class representative must demonstrate that he or
9  she "suffered injury in fact and has lost money or property as a result of the unfair
10 competition." Cal. Bus. & Prof. Code § 17204. A plaintiff suffers an injury in fact for
11 purposes of prudential standing under the UCL when he or she has: (1) expended money
12 due to the defendant's acts of unfair competition, (2) lost money or property, or (3) been
13 denied money to which he or she has a cognizable claim. Hall v. Time Inc., 158 Cal. App.
14 4th 847, 854-55 (2008). The "injury in fact" and "lost money or property" requirements of
15 § 17204 overlap. See Troyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305, 1348 (2009).
16 The "as a result of" language of § 17204 imposes a causation requirement. See Rubio v.
17 Capital One Bank, 613 F.3d 1195, 1204 (9th Cir. 2010) ("[the UCL] requires a 'causal
18 connection' between [the defendant]'s alleged UCL violation and her injury in fact");
19 Troyk, 171 Cal. App. 4th at 1349 ("the phrase 'as a result of' connotes an element of
20 causation (i.e., [plaintiff] lost money because of [defendant]'s unfair competition).").

21      Here, Plaintiffs allege both that they did not receive the full value of the Workout
22 Agreements and that they lost their homes to foreclosure. These allegations are sufficient
23 for purposes of prudential standing under the UCL. See, e.g., Pinel, 2011 WL 3843960, at
24 *9; Lozano v. AT & T Wireless Servs, Inc., 504 F.3d 718 (9th Cir. 2007) (finding injury
25 under the UCL established where plaintiff "did not receive the full value of his contract");
26 Susilo v. Wells Fargo Bank, N.A., No CV 11-1814 CAS, 2011 WL 2471167, at *15 (C.D.
27 Cal. June 21, 2011) (finding allegations that defendants foreclosed on plaintiff's property
28 unlawfully, without authority and through fraudulent misrepresentations, were sufficient at

the pleading stage to establish that plaintiff suffered an injury in fact and a loss of money or property under the UCL).

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. Aurora's motion to dismiss is DENIED.

2. The parties shall appear for a telephonic Case Management Conference on **October 26, 2011 at 3:00 p.m.** Prior to the date scheduled for the conference, the parties shall meet and confer and prepare a joint Case Management Conference Statement. Plaintiff is responsible for filing the joint statement no less than seven (7) days prior to the conference date. The joint statement shall comply with the Standing Order for All Judges of the Northern District of California and the Standing Orders of this Court. Plaintiff is responsible for setting up the conference call. On the specified date and time, Plaintiff shall call (510) 637-3559 with all parties on the line.

3. Absent prior leave of Court, any additional motions and oppositions thereto shall be limited to fifteen (15) pages and replies are limited to ten (10) pages.

4. This Order terminates Docket 27.

IT IS SO ORDERED.

Dated: September 12, 2011

                                                      SAUNDRA BROWN ARMSTRONG
                                                      United States District Judge